CARLTON, J.,
for the Court:
¶ 1. Bryan Keith Masters filed a motion for modification of child custody in the Hinds County Chancery Court, alleging that a material change in circumstances had occurred in the child’s custodial home which was adverse to the child and warranted a change in custody from the child’s mother, Hether Brooke Laird Masters, to him. After hearing the testimonies of the parties and witnesses, the chancellor found that no material change in circumstances had occurred in Hether’s home and denied Bryan’s motion. Aggrieved, Bryan appeals.
¶ 2. We reverse the chancellor’s judgment and remand this case to the chancellor for reconsideration of her denial of the request to modify custody and for new findings in support of the chancellor’s reconsidered findings.
*1280 FACTS
¶ 3. Bryan and Hether married in Rankin County in 1998. Their daughter, Som-mer Grace Masters, was born later that same year. Bryan and Hether divorced in July 2000, and Hether received physical custody of Sommer. Nine years later, in March 2009, Bryan moved the Hinds County Chancery Court for a change in custody.
¶ 4. Hether testified that following her divorce from Bryan, she lived with her mother for a short period of time before moving into a residence with her then-boyfriend, Michael Poor. Hether married Poor in 2001. Hether subsequently divorced Poor in 2003, and she received custody of her child from that marriage as well. Hether then began living with a second boyfriend, Josh Pilgrim, for four consecutive years in the same residence she had shared with Poor. Hether and Pilgrim never married or had children. When her relationship with Pilgrim ended, Hether began cohabiting with her third boyfriend, Jerry Peavey.
¶ 5. At the time of the hearing, Hether had lived at her current address for approximately one and one-half years with Peavey, to whom she claimed to be engaged. Peavey was forty-seven years old at the time of the hearing. Peavey had been married and divorced twice before, and he had a twenty-eight-year-old son from an earlier relationship. Hether and Peavey also have one child together, who was three months old at the time of the hearing. Although both Hether and Peav-ey testified that they planned to marry in the future, the record is clear that the couple had not married nor agreed on a specific date to marry. Hether admitted in her testimony that she cohabited with three different men after her marriage to Bryan had ended. Hether cohabited with various men for eight and one-half of the nine years since her divorce from Bryan. Hether was married for only two of those years.
¶ 6. Regarding Hether’s current relationship with Peavey, and its impact upon Sommer, testimony at trial reflects that Hether’s cohabitation with Peavey had the potential to impact Sommer negatively. Hether testified that police officers arrested Peavey inside the home, when Sommer was present, for purchasing a stolen washing machine. Peavey testified that the arrest was for “false pretense” and that he has not been indicted. According to Peav-ey, police officers came to the home he shares with Hether to question him regarding the stolen washing machine. When they checked his record, they arrested him for worthless checks that Peav-ey claims were stolen from him and then cashed from his bank account. Peavey testified that he had filed a police report regarding the stolen checks.
¶ 7. Peavey also testified that because he is unable to work because of an on-the-job injury, he stays home with his and Hether’s infant son. He also testified that he keeps Sommer and her younger half sister while Hether is away. Peavey, who only finished tenth grade, helps the children with their homework after school.
¶ 8. In his motion for modification, Bryan alleged that the following actions constituted a material change in circumstances adverse to Sommer’s well-being: Hether disregarded Sommer’s learning disability and failed to meet her treatment needs; Hether placed Sommer with Bryan’s parents or Rita Kerry every weekend “in order to pursue her social calendar”; Hether lived with various men without the benefit of marriage in the presence of Sommer; Hether and Peavey smoked in Sommer’s presence; Hether failed to provide appropriate dental care for Sommer; Peavey had a “physical altercation” with a police officer and was arrested in Som- *1281 mer’s presence; and Sommer suffered from a lack of self-confidence.
¶ 9. The chancellor considered the testimony provided at the trial and ultimately concluded that Bryan had failed to show a material change in circumstances adverse to Sommer warranting a modification of custody.
STANDARD OF REVIEW
¶ 10. This Court has a limited scope of review in challenges to a chancellor’s decision to deny a custody modification. Creel v. Cornacchione, 831 So.2d 1179, 1183 (¶ 14) (Miss.Ct.App.2002). “We can reverse only when a chancellor’s decision is either manifestly wrong or clearly erroneous, or when the chancellor has applied an erroneous legal standard.” Id.
¶ 11. In order for a chancellor to modify a child-custody decree, the noncustodial parent must prove the following: “(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child.” Powell v. Powell, 976 So.2d 358, 361 (¶ 11) (Miss.Ct.App. 2008) (citing Giannaris v. Giannaris, 960 So.2d 462, 467-68 (¶ 10) (Miss.2007)). This Court has recognized in previous cases that while several factors are involved in the initial consideration of a child-custody award, only parental behavior that poses a clear danger to the child’s physical, mental, or emotional health justifies a change in custody. See Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983); Lambert v. Lambert, 872 So.2d 679, 684 (¶ 22) (Miss. Ct.App.2003); Morrow v. Morrow, 591 So.2d 829, 833 (Miss.1991); Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996).
DISCUSSION
¶ 12. The chancellor’s bench ruling in this case reflects a misapplication of the law limiting her authority to consider the impact of adverse effects of the custodial parent’s extramarital relationships upon the child’s welfare in ascertaining whether any adverse material change of circumstance has occurred herein. Reversal is proper if this Court determines that the chancellor applied an incorrect legal standard, as our review is de novo when considering matters of law. Carter v. Carter, 735 So.2d 1109, 1114 (¶ 20) (Miss.Ct.App.1999). Therefore, we find remand necessary to ensure that the circumstances of this case are considered under the applicable legal standards by the fact-finder. As an appellate court, we provide no finding as to whether an adverse material change occurred in this case. We instead submit such fact heavy determinations to the chancellor who is to utilize the traditional custody-modification test to determine whether any material change adverse to the child occurred in this case. See Powell, 976 So.2d at 361 (¶ 11) (citing Giannaris, 960 So.2d at 467-68 (¶ 10); Sullivan v. Stringer, 736 So.2d 514, 517 (¶¶ 15-16) (Miss.Ct.App.1999)) (explaining that a finding of adverse impacts upon a child resulting from a parent’s sexual relationships, either by themselves or in conjunction with other factors, may be sufficient to give rise to a material change in circumstance).
¶ 13. The text of the chancellor’s bench opinion provides that the chancellor refrained from considering the impact of Hether’s various sexual or extramarital relationships in determining whether an adverse material change in circumstances had occurred sufficient to justify a change in custody. The text of the bench opinion also expressed specific concern over the instability caused by Hether’s relationships, but the bench opinion also reflects that the chancellor felt precluded by precedent of the Mississippi Supreme Court from considering those effects of parental conduct. The chancellor viewed the law as *1282 precluding the consideration of the effects of parental extramarital or sexual conduct on the child’s welfare; therefore, the chancellor’s analysis omitted consideration of any effects upon Sommer resulting from Hether’s relationships.
¶ 14. Significantly, the chancellor’s bench opinion provides that a question indeed arose in the chancellor’s mind as to whether Hether’s unstable marital and extramarital relationships created a material change in circumstances adversely affecting Sommer. The bench opinion then continues to explain that the social fabric of our society evolved “to where living with someone without the benefit of marriage now constitutes the norm.” The chancellor further provided that although she disagreed, she understood Mississippi precedent to hold that extramarital relationships constituted an insufficient basis to find a material change in circumstances that adversely affects the child and that some independent finding of adversity must exist before finding a material change in circumstances. Therefore, the bench opinion reflects a misapplication of the law precluding consideration of the effects, if any, of Hether’s extramarital relationships upon the child in accessing whether a material change in custody occurred.
¶ 15. The chancellor correctly noted that the existence of an extramarital relationship by itself fails to provide sufficient basis for a finding of adverse material change. This case, however, encompasses more than the mere existence of an extramarital relationship. The chancellor’s bench opinion acknowledges the instability impacting Sommer’s home environment due to Hether’s numerous unstable relationships. The chancellor’s opinion also reflects a finding that Hether’s current paramour, Peavey, lives with Hether, and the opinion notes that Peavey engaged in an altercation with the police in Sommer’s presence. The record also provides that the police arrested Peavey at the home he shares with Hether, and the record reflects that this home is the custodial home. The chancellor certainly may consider the impact and the effects of the parents’ relationships upon the child in determining whether a material change has occurred in the custodial home. In assessing whether a change in circumstances adverse to the child’s welfare occurred, an evaluation of such circumstances may indeed include consideration of any adverse impact upon the child caused by others also living in the custodial home.
¶ 16. With respect to the educational support and stability needed, testimony in the record reveals that Sommer suffers from a learning disability, and the chancellor found Sommer needs additional help with her school work. Peavey serves as the primary child-care provider for Som-mer, and he assists her with her homework despite his lack of education beyond the tenth grade. With respect to stability in the home environment, both the chancellor’s opinion and the record reflect that since Hether’s divorce from Bryan, Hether has cohabited with three different male companions, only one of whom she eventually married. The chancellor acknowledged that Hether’s series of live-in boyfriends reflected instability in Hether’s and Sommer’s home environment. The chancellor nonetheless refrained from considering the impact of the relationships as to any material adverse change in circumstances in Sommer’s home because she perceived the law as requiring something independent of Hether’s romantic relationships to find adversity.
¶ 17. As the chancellor acknowledged, precedent indeed establishes that cohabitation alone fails to give rise to a material change in circumstances, but our case law clearly allows the chancellor to consider any adverse impact resulting from a par *1283 ent’s sexual relationships or cohabitation. Sullivan, 736 So.2d at 517 (¶ 16). In Sullivan, this Court stated that:
The impact of these relationships, either by themselves or in conjunction with other factors, must rise to a level justifying a change in custody. The supreme court has made plain, despite the criminal nature of these acts, that cohabitation is relevant only to the extent it can be shown to affect the child adversely. Cheek v. Ricker, 431 So.2d 1139, 1144 (Miss.1983). In effect[,] the supreme court has indicated that the mores of modern society are such that moral conduct by a custodial parent is difficult to make a requirement in a divorce. Absent a finding of some conduct harmful in a more specific sense than the certain knowledge of sexual relations between unmarried adults, one of whom is the custodial parent, the court has held that custody cannot be withheld on that basis.
Id.; see also McCracking v. McCracking, 776 So.2d 691, 694 (¶ 10) (Miss.Ct.App.2000) (finding no evidence that the custodial parent’s lifestyle caused detrimental effects to the child and that in order to change custody, the noncustodial parent bears the burden of showing an adverse material change in circumstances affecting the child).
¶ 18. As noted above, current jurisprudence provides that repeated cohabitation standing alone fails to constitute a barrier to custody. See Sullivan, 736 So.2d at 518 (¶¶ 18-19). However, as stated in Sullivan, the existence of the relationship coupled with other adverse impact on the child, or conduct that indicates the custodial parent’s behavior is harmful in additional ways, provides a sufficient basis to warrant a custody modification. Id. at 518 (¶ 20). While we commend the chancellor’s effort to adhere to precedent when addressing the evolving moral conduct of parents, the failure to consider the noted impact of Hether’s conduct on Sommer’s welfare in the evaluation of whether a material change had occurred created insurmountable error by the chancellor’s misapplication of the law.
¶ 19. We acknowledge that while parents indeed possess the freedom to choose various behaviors, they nonetheless must face the consequences of the impact that their choices have upon their child’s welfare and custodial home environment. In this case, the chancellor explained that while she disagreed with Hether’s lifestyle choices, she concluded that the law regarding custody modifications limited her power to modify child custody. We would agree with the chancellor if the record herein reflected only the existence of cohabitation with no findings of adverse effects upon Sommer. However, the chancellor’s bench opinion shows that the chancellor held a concern as to whether the mother’s unstable and extramarital relationships created a material change, but the chancellor’s concern was not considered in her determination of the case. Instead, the chancellor excluded consideration of the impact of those relationships upon the child because she felt precedent prevented such consideration in evaluating whether a material change had occurred. The chancellor may consider the effects, if any, of Hether’s relationships upon the child as a factor in the traditional test when evaluating whether a material change of circumstances adverse to the child has occurred sufficient to warrant a custody modification.[1] See 4 Deborah H. *1284 Bell, Divorce and Domestic Relations, Encyclopedia of Mississippi Law § 28:14 at 220 (Jeffery Jackson & Mary Miller ed.2001). Indeed, in Carter, 735 So.2d at 1114, we stated that the chancellor is best equipped to listen to the witnesses, observe their demeanor, and determine their credibility and what weight ought to be ascribed to the evidence given by those witnesses. When conflicting testimony on the same issue is presented, the chancellor, sitting as the trier of fact, must determine which version he or she finds more credible. Id. However, as to matters of law, our review is de novo, and we must reverse if we determine that the chancellor applied an incorrect legal standard. Id. So, we reverse the chancellor’s judgment and remand this case to the chancellor, the trier of fact, to answer the factual question of whether a material change adverse to Sommer has occurred herein.[2] In conducting that fact-determination, a chancellor possesses no obligation to turn a blind eye to an adverse impact upon the child that the chancellor finds to result from the parents’ sexual conduct or relationships. When determining whether a material change in circumstances exists, the chancellor must consider the totality of the circumstances. Williams v. Willis, 49 So.3d 122, 124-25 (¶ 7) (Miss.Ct.App.2010).
¶ 20. Based upon the foregoing, we reverse and remand this case for the chancellor to reconsider whether the effects, if any, of Hether’s relationships, in conjunction with other factors, rise to a level of adverse material change sufficient to justify a change in custody.
¶ 21. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
KING, C.J., LEE, P.J., AND ISHEE, J., CONCUR. ROBERTS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J., GRIFFIS AND MAXWELL, JJ. BARNES, J., CONCURS IN PART AND IN THE RESULT. IRVING, J., NOT PARTICIPATING.

. In cases where the custodial parent places the child at risk, the supreme court in Riley, 677 So.2d at 744-45, expressed concern that chancellors felt constrained by the framework for custody modification which requires a material change in circumstances before a chancellor may modify a custody order. The supreme court stated the following:
when the environment provided by the custodial parent is found to be adverse to the *1284 child’s best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly.
Id. at 744.
Noting that the court’s polestar consideration in child-custody matters is the best interest of the child, the supreme court further stated the following with regard to the requirements for a modification of child custody:
The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child’s welfare would be best served by such transfer.
Id. at 745.

. See also Riley, 677 So.2d at 744.